**HERITAGE BANK & TRUST COMPANY, Plaintiff–Appellant,**

v.

**James ABDNOR, Administrator, United States Small Business Administration, Lewis F. Matuszewich and Lewis F. Matuszewich, P.C., Defendants–Appellees.**

**No. 89–1990.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1990.

Decided July 3, 1990.

---

Barry Sullivan, Joel S. Corwin, Norman Rifkind, Jenner & Block, Peter V. Baugher, Adams, Fox, Adelstein, Rosen & Bell, Chicago, Ill., for Heritage Bank & Trust Co.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for James Abdnor.

D. Kendall Griffith, Ellen L. Zopff, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Lewis F. Matuszewich and Lewis F. Matuszewich, P.C.

Before CUMMINGS, CUDAHY and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Heritage Bank & Trust ("Heritage") made a loan to Kautzmann Steel, Inc. that enabled Kautzmann Steel to purchase most of the assets of Beverly Steel, Inc. The Small Business Administration (the "SBA") guaranteed 90% of the loan. When Kautzmann Steel defaulted on the loan, Heritage asked the SBA to assume its portion of the debt. The SBA refused, explaining that the undisclosed status of William Parker, Beverly Steel's principal shareholder, as a director of Heritage violated the SBA's conflict of interest regulations. Heritage sued to compel the SBA to assume the Kautzmann Steel loan. Heritage also sued Lewis Matuszewich and Matuszewich's corporate persona (collectively referred to as "Matuszewich") for allegedly giving Heritage erroneous advice which the Bank followed in choosing not to disclose Parker's status to the SBA.

We must decide whether, under the circumstances of this case, the disclosure of Parker's status as a Heritage director was a condition precedent to the SBA's contractual obligations as guarantor of the loan or, in the alternative, whether the nondisclosure constituted a material breach of Heritage's agreement with the SBA. We conclude that the conflict of interest in this case was a condition precedent to SBA's participation in the Kautzmann Steel loan, and that, in any event, Heritage materially breached the parties' Loan Guaranty Agreement by neglecting to disclose Parker's status to the SBA. We also find that the district court lacked jurisdiction over Heritage's claims against Matuszewich.

## I. FACTS

Congress enacted the Aid to Small Business Act, 15 U.S.C. § 631 et seq., in order to enhance competition in various markets

by assisting small, individually-owned business concerns, particularly those in economically distressed urban and rural areas. 15 U.S.C. § 631(d)(1). Under the Act, the SBA is authorized to enter into loan guaranty agreements, whereby participating banks may lend money to qualifying small businesses,[1] with SBA approval, and the SBA may accordingly agree to purchase a fixed percentage (up to 90%) of the outstanding loan from the lender in case of default. Pursuant to its statutory authority, the SBA has promulgated numerous rules and regulations (Heritage counts more than 400 pages of SBA regulations in the Code of Federal Regulations), including regulations pertaining to conflicts of interest involving the lender and borrower. 13 C.F.R. section 120.5(a)(1) (1983)[2] provides, in relevant part:

> (a) *General.* Lenders must observe the following regulations as a condition of their continuing eligibility as participants:
>
> (1) *Conflicts.* Without the prior written approval of the responsible SBA district office, SBA will not participate in any loan to a small business concern in which the lender has, or acquires while the loan is outstanding, a direct or indirect interest. For example:
>
> (i) SBA will not participate in any loans made to an Associate;
>
> (ii) SBA will not participate in any loan made for the purpose of financing, directly or indirectly, the purchase of real or personal property, or of services, from the lender or any Associate unless SBA shall have first made a written determination that the purchase of the property or services from the lender or Associate is in the best interests of the small business concern.

Further, 13 C.F.R. section 120.5(a)(5) states:

> (5) *Prohibited Relationship.* The "Associate" relationship defined in paragraphs (d)(1), (2) and (3) of § 120.1 is prohibited during the life of any loan

made by the lender in which SBA participates. At SBA's discretion, a violation of this regulation by the officers and directors of the lender who are responsible for making the servicing decisions on the loan could result in a partial or full loss of the SBA guarantee and an obvious violation by the borrower could result in acceleration of the loan. Unintentional violations by either the lender or the borrower could result in less severe actions such as requesting that the relationship be terminated, that all requests for modification of loan terms be denied while the violation continues or other appropriate action that is commensurate with the seriousness of the violation.

An "Associate" is defined as an "Associate of the lender" and includes "any officer or director of the lender," 13 C.F.R. § 120.1(d)(1), and "[a]ny enterprise in which any person or entity ... described in the preceding paragraphs (d)(1) or (2) of this section shall be an officer, director, or partner, or in which any such person or entity, either individually or in concert with any other person or entity shall have a direct or indirect interest of ten percent or more in stock, debt instruments, or other securities." 13 C.F.R. § 120.1(d)(3).

Heritage entered into a Loan Guaranty Agreement with the SBA on October 6, 1980. Although the Agreement did not specifically mention the consequences of the lender's violation of the SBA's conflict of interest regulations, Paragraph 1 provided that the Agreement would "cover only loans duly approved hereafter for guaranty by Lender and SBA *subject to SBA's Rules and Regulations as promulgated from time to time.*" (Emphasis added.) In addition, 13 C.F.R. section 122.10(b)(1)(iii) provides:

> SBA shall be released from any obligation to purchase its share of a guaranteed loan if the lender has not *substantially complied* with all of the provisions

---

**1.** There is no dispute that Kautzmann Steel was a qualified enterprise.

**2.** Unless otherwise noted, all references are to the 1983 edition of the Code of Federal Regulations.

of these regulations and the guaranty agreement.

(Emphasis added.)

On October 4, 1982, Heritage applied to the SBA for a 90% guaranty of a $550,000 loan to Kautzmann Steel for the purchase of most of Beverly Steel's assets. Under the terms of the purchase agreement, Parker would retain ownership of Beverly Steel's premises and would issue a $300,000 note to support Kautzmann Steel's financing of the deal.

Matuszewich, an attorney and a former deputy regional director of the SBA's Chicago office, assisted Kautzmann Steel in completing the documentation required for the SBA guaranty.[3] During discussions with Matuszewich about the loan, John Vax, Heritage's Vice President in charge of the loan, asked Matuszewich whether it would be necessary for Heritage to disclose to the SBA Parker's status as a member of its board. According to Heritage, Matuszewich replied that disclosure was not necessary. On several other occasions when Vax brought up the topic again, Matuszewich allegedly reassured Vax each time that Parker's status would not preclude the guaranty and need not be disclosed to the SBA.[4] Vax signed the Lender's Application for Guaranty (Form 4–I) below the following certification:

> I approve this application to SBA subject to the terms and conditions outlined above. Without the participation of SBA to the extent applied for we would not be willing to make this loan, and in our opinion the financial assistance applied for is not otherwise available on reasonable terms. I certify that none of the Lender's employees, officers, directors or substantial stockholders (more than 10%) *have a financial interest in the applicant.*

Appellee's App. at 11 (emphasis added). Although Heritage described the terms of

the loan and its long relationship with Beverly Steel, it did not disclose on this form the fact that Parker was a Heritage director. When the loan was presented to Heritage's loan committee, it was approved, with Parker abstaining from the vote.

The SBA denied the initial application, citing credit deficiencies. On December 21, 1982, Vax and Matuszewich met with Verdie Glover, the SBA loan officer responsible for Heritage's application, to discuss the reasons for the denial and to urge reconsideration of the application. Vax and Matuszewich did not disclose to Glover Parker's membership on Heritage's board.

On January 10, 1983, Vax sent a letter to Glover noting that the terms of the sale of Beverly Steel's assets had been changed: the total sale price was reduced from $850,000 to $750,000; the amount to be paid in cash at the closing was reduced from $550,000 to $500,000; Parker would take a note from Kautzmann Steel for $250,000 (for four years at 14% interest) instead of $300,000; and Peter Kautzmann, the sole stockholder of Kautzmann Steel, would obtain a personal loan for $50,000, which he would invest in the enterprise. On that same day, Heritage submitted a new Lender's Application for Guaranty, seeking a guaranty by the SBA of a $500,000 loan to Kautzmann Steel. Once again, Heritage failed to disclose Parker's board membership.

The SBA approved the amended loan application on January 25, 1983. The sale closed on March 9, 1983. $209,341.96 of the loan amount was paid jointly to Heritage and Beverly Steel to pay off a debt owed by Beverly Steel to the bank. The remaining $290,658.04 was paid to Beverly Steel alone.

On March 18, 1985, Heritage informed the SBA that Kautzmann Steel had defaulted on the loan and had filed a petition in bankruptcy under Chapter 11. Heritage

---

**3.** Heritage apparently claims that Matuszewich was advising it, as well as Kautzmann Steel, in the SBA application process. Matuszewich disputes this assertion and maintains that he was representing only Kautzmann Steel. Because we dismiss Heritage's claims against Matuszewich for lack of jurisdiction, we do not reach the merits of this dispute.

**4.** Again, we express no opinion on the merits of any state law claim Heritage might have against Matuszewich as a result of these conversations.

requested the SBA to honor its 90% guaranty and purchase the balance of the loan. The SBA alleges that prior to the default, none of its personnel was ever made aware that Parker sat on Heritage's board of directors at the time the loan was approved. The SBA's Chicago District Director, John L. Smith, informed Heritage on July 22, 1986, that Charles Heatherly, Acting Administrator of the SBA, had authorized the SBA to deny liability under the Guaranty Agreement because of Heritage's violation of the SBA's conflict of interest regulations. Heritage responded by filing this suit, charging the SBA with breach of contract.

On cross motions for summary judgment, the district court ruled in favor of the SBA. Citing our decision in *Eastern Illinois Trust & Savings Bank v. Sanders*, 826 F.2d 615 (7th Cir.1987), the district judge concluded that the SBA's conflict of interest regulations constituted a condition precedent to the SBA's guaranty of the Heritage loan to Kautzmann Steel. The court further held that the violation of the conflict of interest regulations materially breached the Guaranty Agreement and that, therefore, the SBA was not required to purchase any portion of the outstanding loan, 705 F.Supp. 439. This appeal ensued.

## II. HERITAGE'S CLAIMS AGAINST THE SBA

Heritage contends that the SBA was obligated to assume the agreed portion of the Kautzmann Steel loan, notwithstanding the violation of the agency's conflict of interest regulations, for three reasons.[5] First, Heritage argues that the district court erred as a matter of law in considering compliance with the conflict of interest regulations a "condition precedent" to the SBA's guaranty. Second, Heritage asserts that its noncompliance with the conflict regulations did not constitute a material breach of the Guaranty Agreement, since Heritage had "substantially complied" with the condi-

tions of the Agreement, as required by 13 C.F.R. section 122.10(b)(1)(iii). Finally, Heritage urges us to rule that the SBA is estopped from dishonoring the loan guaranty because the SBA prepared the certification contained in Form 4-I (which Heritage labels ambiguous) and knew the contents of its own regulations (of which Heritage claims ignorance).

### A. Condition Precedent to the SBA's Participation in the Loan

■ In this case, there were two contracts. The Guaranty Agreement established the terms for Heritage's participation in the SBA loan guaranty program; it incorporated by reference all SBA rules and regulations promulgated from time to time. The second contract at issue, the terms of which were set out in Form 4-I, specified the conditions of the particular loan to Kautzmann Steel. The existence of and difference between the two contracts is important: by violating the conflict regulations, Heritage *breached* the Guaranty Agreement, since it failed to comply with the term requiring the bank's adherence to all agency regulations. On the other hand, nondisclosure of Parker's conflict of interest constituted a failure to fulfill a *condition precedent* to the Kautzmann Steel loan guaranty, since the Kautzmann Steel loan was expressly covered by the terms of the Guaranty Agreement.

A condition precedent has been defined as a condition "which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed," or a condition "that is to be performed before the agreement becomes effective, and which calls for the happening of some event or the performance of some act after the terms of the contract have been arrested on [sic], before the contract shall be binding on the parties...." Black's Law Dictionary 266 (5th ed. 1979). A condition precedent may be express, or it

---

**5.** Heritage does not deny that it violated the SBA's regulations by failing to disclose Parker's status as a board member. Parker and Beverly Steel were both "Associates" of Heritage, within the meaning of 13 C.F.R. sections 120.1(d)(1)

and (d)(3). Therefore, the loan was made to Kautzmann Steel for the purpose of financing the purchase of real property from an Associate of the lender.

may be implied by law, "from the nature of the transaction or the conduct of the parties, to have been tacitly understood between them as a part of the agreement, though not expressly mentioned." *Id.* at 265; *see also* Restatement (Second) of Contracts § 226 (1981) ("An event may be made a condition either by the agreement of the parties or by a term supplied by the court."). The Restatement (Second) of Contracts eschews the labels "condition precedent" and "condition subsequent" and simply defines a "condition" as "an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 & comment e. Regardless of the title used, authorities agree that the non-occurrence of a condition imposed upon one party by a contract will in many cases discharge the other party's duty to perform. *See id.* at § 225(2) ("Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.").

Heritage argues that the law disfavors the imposition of a condition precedent without evidence of the parties' express consent to such a term. Whether or not Heritage's position in this regard is correct, we believe that compliance with the SBA's conflict of interest regulations was clearly a condition precedent to the SBA's guaranty of the Kautzmann Steel loan. 13 C.F.R. section 120.5(a)(1)(ii) *expressly* conditions SBA participation in a loan involving a conflict of interest upon the receipt by the lender or borrower of a *prior* written determination by the SBA that the loan serves the best interests of the small business. While the requirement of a prior act does not in all cases compel the label of condition precedent, it does constitute some proof of the parties' intention to create a condition precedent.

We agree with Heritage that the proper standard for determining the existence of a condition precedent, when the court is in doubt about the parties' intent, is set out in the Restatement (Second) of Contracts, section 227. The Restatement explains the principle as follows:

(1) In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, *unless the event is within the obligee's control or the circumstances indicate he has assumed the risk.*

. . . . .

(3) *In case of doubt,* an interpretation under which an event is a condition of an obligor's duty is preferred over an interpretation under which the nonoccurrence of the event is a ground for discharge of that duty after it has become a duty to perform.

(Emphasis added.) In our view, the Restatement offers Heritage no comfort. Clearly, Heritage had the power (as well as the obligation) to disclose the conflict to the SBA.[6] Further, section 120.5(a)(5) unambiguously warns that a violation of the conflict provisions might result in partial or total loss of the guaranty; this provision eliminates any doubt that nondisclosure of Parker's conflict was grounds for discharge of the guaranty.

Moreover, we are persuaded that the objectives of the SBA loan guaranty program are best served by viewing compliance with the conflict regulations as a condition precedent. By requiring a prior written determination, the SBA can closely scrutinize transactions in which an associate of the lender may wield undue leverage over a small business applicant and may use this power to squeeze benefits out of the small business. We do not question Heritage's claim that it and Parker acted in good faith in this transaction. However, we believe

---

**6.** Heritage suggests here, as it did in the lower court, that the SBA had "constructive knowledge" of Parker's membership on the bank's board because the SBA had on file Heritage's annual report. The SBA's possession of Heritage's annual report is simply irrelevant: Heritage cannot excuse its failure to meet its own obligation to *actively* seek a prior written determination by the SBA of the propriety of the loan. We approve the district court's refusal to permit Heritage to impose on the SBA the burden of discovering Heritage's violation.

the SBA is justifiably concerned about guarantying loans that may redound substantially to the benefit of an associate of the bank, rather than to the struggling small business. The SBA does (and should) have within its arsenal the power to repudiate guaranties made under such questionable circumstances, even if the transaction ultimately turns out to have been fair in result. The SBA must protect both the small business and its own limited resources from abuse.

In support of its argument that compliance with the conflict regulations was not a condition precedent, Heritage cites our decision in *Eastern Illinois Trust & Savings Bank v. Sanders*, 826 F.2d 615 (7th Cir. 1987), *aff'g* 631 F.Supp. 1393 (N.D.Ill.1986). In *Eastern Illinois*, the bank made secondary loans at higher interest rates to four borrowers with outstanding loans guarantied by the SBA, but failed to disclose to the SBA the side loans and the side fees charged to the borrowers in connection with those loans. The loans violated SBA regulations and a term of the Guaranty Agreement. When the borrowers defaulted, the SBA refused to honor its guaranties because of the violations. We determined, however, that the SBA could not repudiate the guaranties because the evidence produced at trial showed that the breach was not material; we did not consider the term barring the side loans to create a condition precedent. Indeed, we specifically distinguished the term at issue in *Eastern Illinois* from terms in other cases that had been deemed conditions precedent. *Eastern Illinois* is, therefore, not relevant to this aspect of our inquiry.[7] We did, as Heritage points out, refer in *Eastern Illinois* to a Court of Claims case that characterized the conflict regulations at issue here as conditions precedent. 826 F.2d at 618, *citing First Nat'l Bank of Louisa, Ky. v. United States*, 6 Cl.Ct. 241 (1984). But in *Eastern Illinois* we did not analyze the *Louisa* holding and will take this op-

portunity to elaborate upon that case, which supports the present result.

For *Louisa* involved facts quite similar to those we face here. In *Louisa*, the bank agreed to lend funds to Elbert See for the purchase of a motel owned jointly by Mae Newberry and Wayne Bromley; See dealt primarily with Newberry. Bromley was a director of the Louisa bank and also owned 9% of the bank's outstanding stock. An officer of the bank prepared the SBA application—the first the bank or the officer had ever handled. When the loan was presented to the loan committee for approval, Bromley abstained from voting. As part of the sale, Bromley took a note from See for $15,000. See defaulted, and the SBA, when it discovered Bromley's membership on the bank's board, refused the bank's request to purchase the loan.

Although the Court of Claims in *Louisa* did not attach a specific legal label to the facts, it treated the bank's nondisclosure as the failure of a condition precedent to the SBA guaranty. The court's approach is evident in its conclusion: "Although [the bank] acted in good faith, its actions precluded compliance with the explicit SBA regulations requiring a prior written determination. Absent this determination, SBA cannot be required to honor the guarantee agreement." 6 Cl.Ct. at 245. We agree with the *Louisa* court's holding and find its logic persuasive in the present case.

█ In *Louisa*, the bank claimed ignorance of the SBA's conflict regulations because of its loan officers' inexperience with the SBA loan guaranty program. The Court of Claims correctly ruled (as did the district court in this case) that good faith and ignorance are no excuse for failure to comply with the regulations; a bank participating in the SBA program is bound by and charged with knowledge of the agency's regulations.[8] *See Louisa*, 6 Cl.Ct. at 244 (citing *Federal Crop Ins. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 3–4, 92 L.Ed.2d 10 (1947)); *Heritage Bank & Trust Co. v. Abdnor*, 705 F.Supp. 439, 441–42

---

**7.** We discuss below the importance of *Eastern Illinois* as it may relate to the materiality of Heritage's breach of the Guaranty Agreement.

**8.** Heritage does not challenge the legitimacy of the SBA's conflict regulations.

(N.D.Ill.1989) (same). Consequently, Heritage cannot take refuge in the contention that its failure to disclose Parker's board membership was inadvertent.

In any event, we would have difficulty accepting Heritage's protestations of inadvertence; the conflict of interest could not have been more obvious. Parker stood to benefit from the deal in three ways: by the sale of most of the assets of his company (possibly at some profit), by the retirement of a debt owed by his company to Heritage and by the interest he personally would draw upon the note he extended to Kautzmann Steel. Further, Vax was an experienced loan officer who obviously knew enough to question Matuszewich on several occasions about the need for disclosure of the conflict. Parker's abstention from the vote approving the Kautzmann Steel loan indicates Heritage's recognition of the conflict.[9] Under these circumstances, a responsible bank officer would at least have attempted to gain a further opinion from an attorney familiar with the SBA's regulations or simply would have asked the SBA itself about the effect on this loan of Parker's conflict.

For all these reasons, the prior provision by the SBA of a written determination of the effect of Parker's conflict of interest was a condition precedent to the SBA's guaranty of the Kautzmann Steel loan. Heritage's failure to obtain the prior written determination (or even to seek it) discharged the SBA's duty to assume 90% of the defaulted loan.

■ Heritage argues that its violation of 13 C.F.R. section 120.5(a) should at worst have affected only Heritage's eligibility as a continuing participant in the SBA loan guaranty program, but cannot authorize the SBA to dishonor a loan guaranty already made and approved. We agree with Heritage that the SBA could decide to terminate Heritage's future participation in the program because of the bank's material breach of the Guaranty Agreement, as we discuss in greater detail below. We do not, however, agree that the

SBA's only recourse for this blatant violation of its regulations was prospective. Section 120.5(a)(5) explicitly gives the SBA discretion to dishonor part or all of an SBA guaranty in case of a violation of the conflict regulations by the lender's officers and directors. It is true that the SBA may impose a less severe sanction than repudiation when the violation is unintentional. But the SBA possesses broad discretion to determine how it will respond to a violation of the conflict of interest rules, and Heritage has not offered us any evidence that the agency has abused its discretion in this case. Given the glaring conflict of interest here, we could not, in any event, say that the SBA abused its discretion in choosing to dishonor the Kautzmann Steel loan guaranty.

### B. Breach of the Guaranty Agreement

■ Heritage asserts that this case is really about a breach of contract, not the failure of a condition precedent. As we have already explained, there are two separate contracts at issue here: as to the particular loan to Kautzmann Steel (whose terms are specified in Form 4–I), the conflict of interest regulations were a condition precedent to the SBA's guaranty; as to the Guaranty Agreement, however, we agree with Heritage that the regulations constituted a *term* of the contract (*i.e.*, a bargained-for exchange), rather than a condition precedent. Therefore, we apply breach of contract principles to our analysis of the impact of Heritage's violation upon the Guaranty Agreement.

Heritage concedes its breach of the Agreement. It argues that the breach simply was not material, since it "substantially complied" with the regulations and the terms of the Agreement. 13 C.F.R. § 122.10(b)(1)(iii). Heritage apparently believes that compliance with *most* of the terms of the Loan Guaranty Agreement and the applicable regulations will excuse noncompliance with *some* of the terms and regulations. We think, however, that asking whether a lender has "substantially

---

**9.** At oral argument, Heritage stated its belief that applicable banking regulations required

Parker's abstention from the vote because of his interest in the loan.

complied" with the Agreement and regulations is simply another way of asking whether a lender has materially breached the Agreement and/or regulations. If the breach was material, the SBA's refusal to perform was sanctioned both by section 122.10(b)(1)(iii) of the SBA regulations and by principles of general contract law. *See* Restatement (Second) of Contracts § 229 ("To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition *unless its occurrence was a material part of the agreed exchange.*") (emphasis added).

■■■ Among the circumstances we consider in resolving the materiality issue are (1) whether the breach defeated a bargained-for objective; (2) whether the breach caused disproportionate prejudice to the non-breaching party; (3) whether custom or usage shows the breach to be material; and (4) whether allowance of reciprocal nonperformance would result in an unreasonable and unfair advantage to either party. *See Sahadi v. Continental Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir.1983). In *Eastern Illinois Trust & Savings Bank v. Sanders*, 631 F.Supp. 1393, 1396 (N.D.Ill.1986), the district court observed that, in addition to any financial prejudice the SBA may have suffered due to the breach, the court should consider any detriment to the agency's regulatory objectives. We agreed with this addition to the *Sahadi* inquiry, since it accords with the "all-the-circumstances" test of the materiality of a breach. 826 F.2d at 616–17.

Heritage's reliance here on our decision in *Eastern Illinois* is misplaced for several reasons. In *Eastern Illinois*, the district court concluded—after a full trial—that the breach was not material. The court based its decision in large measure on the fact that the SBA could not demonstrate prejudice. The court found that the SBA suffered no enhancement of its risk by reason

of the non-disclosure of the side loans and side fees. Second, the bank had retracted at least two of the side loans before default occurred, thus curing the breach. 631 F.Supp. at 1397 n. 1. Further, the SBA had never before repudiated a guaranty where the SBA had not suffered financial loss or where the lender had corrected the breach. *Id.* at 1397. Thus, the SBA failed to establish the materiality of the bank's breach under the prejudice and the custom/usage prongs of the *Sahadi* inquiry. The district court believed that the SBA would receive an unfair advantage if it were allowed to deny liability under those circumstances. *Id.*

Both this court and the district court were also persuaded in *Eastern Illinois* that recission was not an available remedy because the Guaranty Agreement involved in that case did not specify that the SBA might repudiate a guaranty for breach of the side fees clause. On the other hand, two provisions in that contract pertaining to matters other than side loans clearly warned that repudiation of the guaranty might result from a breach of either of those terms.

But the situation in this case is markedly different. As Heritage stresses, the Guaranty Agreement does not provide for recission in case of a breach of the conflict of interest regulations—nor does the Agreement even specifically mention those regulations. The regulations were, nevertheless, incorporated into the Agreement by reference, and section 120.5(a)(5) specifically mentions the possibility of repudiation by the SBA for a violation of the conflict regulations. Nor was the SBA's action here unprecedented: as in *Louisa*, the SBA exercised its discretion to dishonor the guaranty. We might agree that the violation of some regulations would not preclude a finding that a lender has "substantially complied" with the terms of the Agreement.[10] We believe, however, for the reasons discussed in section II(A) above,

10. Heritage points out a possible conflict between the district court's decision (which we affirm) and *Smithson v. United States*, 847 F.2d 791 (Fed.Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). In

*Smithson*, a husband and wife entered into a loan contract with the Farmers Home Administration (the "FmHA"). That contract included the following clause:

that the conflict of interest regulations are *essential* to the sound operation of the SBA loan guaranty program. Heritage's failure to comply with these regulations was therefore a material breach of the Guaranty Agreement, and the SBA properly invoked its right under section 122.-10(b)(1)(iii) to be released from the obligation to purchase its share of the Kautzmann Steel loan. Essentially, conflict of interest violations as obviously basic as the one present here cannot, under any sound analysis, be swept under the rug.

### C. Estoppel

Finally, Heritage argues that the SBA is estopped from repudiating its guaranty of the Kautzmann Steel loan because the SBA prepared the allegedly ambiguous lender certification contained in Form 4–I. The SBA suggests that this contention was not raised below and has consequently been waived. We agree and therefore decline to address the issue.

### III. HERITAGE'S CLAIMS AGAINST MATUSZEWICH

 Heritage's claims against Matuszewich were based on pendent party jurisdiction. The district court dismissed these claims for lack of pendent jurisdiction when it granted the SBA's motion for summary judgment. We affirm the dismissal of Heritage's claims against Matuszewich, with the additional observation that a majority of the Supreme Court has recently expressed disfavor for pendent party claims. *Finley v. United States,* —— U.S. ——, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (pendent party jurisdiction is not available in suits in federal court under Federal Tort Claims

This agreement is subject to the present regulations of the secured party [FmHA] and to its future regulations not inconsistent with the *express provisions hereof.*

847 F.2d at 794. The *Smithson* clause is functionally identical to the clause in the Heritage–SBA Guaranty Agreement incorporating the SBA's present and future regulations. In *Smithson,* however, it was the borrowers who argued for broad incorporation under this clause of the agency's regulations and charged the agency with violating its own regulations in breach of the loan contract. The Federal Circuit rejected the borrowers' contention that the agency's regulations formed an integral part of their con-

Act). Heritage's appeal from the district court's refusal to permit amendment of the bank's complaint against Matuszewich is consequently dismissed as moot.

### IV. CONCLUSION

Heritage's nondisclosure of Parker's status as a member of its board of directors involved a failure of a condition precedent to the SBA's guaranty of the Kautzmann Steel loan. By choosing not to disclose the conflict of interest to the SBA, Heritage also failed to "substantially compl[y]" with the terms of the Guaranty Agreement and the SBA's regulations. For both these reasons, the SBA was justified in dishonoring its guaranty of the loan. We dismiss Heritage's state law claims against Matuszewich for lack of jurisdiction. The judgment of the district court is therefore

AFFIRMED.

tract with the FmHA, concluding that "[t]his is hardly the type of clause that should be read as incorporating fully into the contract all the FmHA regulations." *Id.*

We agree with the Federal Circuit's view that the clause should not be interpreted to incorporate *every* agency regulation, no matter how trivial. Therefore, we must determine whether a particular regulation is of the sort intended by the parties to be incorporated by reference into their contract. We conclude that the SBA's conflict of interest regulations are so significant that they must be considered part of the parties' agreement.